## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Task Force Officer Kevin Rutina, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. The following affidavit is furnished to support a search warrant for the following: (1) the residence located at 322 Bridge Street, Manchester, New Hampshire ("Bridge Street Residence"); (2) the residence located at 91 Manchester Street, Apartment #2, Manchester, New Hampshire ("Manchester Street Residence"); (3) the residence located at 4 Country Club Drive, Apartment 25, Manchester, New Hampshire ("Country Club Drive Residence"); (4) a gray 2006 Honda CRV, vehicle identification number SHSRD78826U444143, NH registration 4535105 ("Gray Honda"); (5) a black 2015 Honda CRV, vehicle identification number 5J6RM4H33FL090327, NH registration 4575629 ("Black Honda"); and (6) a brown 2002 Honda CRV, vehicle identification number JHLRD78522C080510, NH registration 4646729 ("Brown Honda").

2. Based on the facts and circumstances set forth in this affidavit, I submit that there is probable cause to believe that Darius Augusto Guzman Ruiz a/k/a "Laurey" ("Guzman Ruiz") and his associates are engaged in narcotics trafficking activities that constitute violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 21 U.S.C. § 841(a)(1) (distribution of controlled substances), and that evidence of those offenses will be found in the places to be searched.

3. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am

1

empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

4.      I am a Trooper First Class with the New Hampshire State Police Narcotics Investigations Unit assigned as a Drug Enforcement Administration ("DEA") Task Force Officer with the Southern New Hampshire DEA High Intensity Drug Trafficking Area Task Force in the Manchester District Office and have been so assigned since March of 2019. I have been employed by the New Hampshire State Police since February of 2008. My duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1) and 846. I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, and other substances. I have received significant training in the field of narcotics enforcement and investigations. Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.[1]  In the course of participating in investigations of drug distribution organizations, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search

_____

[1] Observations made and conclusions drawn throughout this affidavit that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

warrants, debriefings of subjects, witnesses, and confidential informants, and reviews of consensually recorded conversations, meetings, and Title III intercepts.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. In preparing this affidavit, I have prepared reports and reviewed reports prepared by other investigators of witness interviews, surveillance, and other investigative efforts regarding this investigation. In addition, I have discussed this investigation with other officers involved in the case. Through these conversations and my own analysis of these reports, I am familiar with all aspects of this investigation. The information contained in this affidavit is submitted for the sole purpose of supplying probable cause for the issuance of search warrants. This affidavit does not set forth all of my knowledge about this investigation.

## **PROBABLE CAUSE**

*Overview of Investigation & Places to be Searched*

6. This investigation is based on controlled drug purchases from Guzman Ruiz, information from confidential informants, and surveillance of Guzman Ruiz and his co-conspirators. Over the past two months, CS #1 has conducted controlled purchases from Guzman Ruiz in either the Gray Honda or the Black Honda, both of which have custom-made hidden compartments that Guzman Ruiz uses to store drugs and drug proceeds. I believe that Guzman Ruiz stores drugs at the Bridge Street Residence as he comes and goes from there before and after most controlled purchases (and on one occasion stopped there after telling the CS that he was picking up drugs). Guzman Ruiz resides at the Country Club Drive Residence and I believe he may store evidence of drug trafficking at his primary residence. I have identified

drug trafficking associates of Guzman Ruiz including his brother A. Guzman and Zapata. I believe that the group uses the Manchester Street Residence, A. Guzman's residence, to store drugs and/or drug proceeds. I also believe that A. Guzman has used the Brown Honda to conduct drug transactions and that it may have an aftermarket hidden compartment.

*CS #1 and Controlled Drug Purchases from Guzman Ruiz*

7.      This section of the affidavit will document the facts supporting probable cause to search the Gray Honda and the Bridge Street Residence. The affidavit is based, in part, on information provided by confidential sources ("CSs").[2] CS #1 provided information to the Manchester Police Department ("MPD") about a drug trafficker named "Laurey," who the MPD later identified as Guzman Ruiz, working in the Manchester, New Hampshire, area.[3] CS #1 bought drugs that he/she re-sold to others from Guzman Ruiz and also has had a social

---

[2] CS #1 originally began cooperating with the MPD after being arrested on charges related to drug distribution. Specifically, the MPD conducted controlled purchases of heroin or fentanyl from CS #1, totaling over 100 grams. CS #1 is facing charges for those sales and is cooperating in hopes of receiving consideration with respect to those pending criminal charges. He/she has not yet been provided with any consideration for those charges. CS #1 has multiple convictions including for Stalking, Disorderly Conduct, Criminal Mischief, Criminal Threatening, and Simple Assault. Since CS #1 began cooperating, other officers and I have corroborated CS #1's information through surveillance and other sources and have found it to be reliable. In addition, I am aware that CS #1 cooperated with another law enforcement agency in the past and was found to be reliable. It was not until after his/her cooperation ended, that law enforcement officers became aware that he/she was selling drugs again, and began the investigation that led to his/her current pending charges.

[3] The MPD has identified "Laurey" as Darius Augusto Guzman Ruiz based on a comparison of his Dominican Republic identification documents with photos taken of him during the controlled purchases with CS #1. In 2017, Guzman Ruiz was stopped by the MPD while driving a vehicle. He gave the MPD his Dominican identification card, which listed an address of 197 Grove Street in Manchester, New Hampshire. Guzman Ruiz was stopped by customs and border protection in Texas on May 26, 2015, after entering the country. He may currently have an application for citizenship pending.

relationship with him for about four years.[4] According to CS #1, Guzman Ruiz runs a drug business in Manchester and sells large quantities of heroin or fentanyl. CS #1 said that Guzman Ruiz would deliver between 100 and 300 grams of heroin or fentanyl to him/her at a time. CS #1 said that he/she believed he/she had seen as much as two kilograms of heroin or fentanyl inside an aftermarket hide in Guzman Ruiz's vehicle. CS #1 said that Guzman Ruiz delivered the drugs alone and rarely had anyone else with him. CS #1 explained that Guzman Ruiz could be contacted at any time and was usually always available to make a delivery.

8.      CS #1 told law enforcement officers that he/she had seen Guzman Ruiz use two vehicles to deliver drugs to him/her, both of which had sophisticated aftermarket hidden compartments that Guzman Ruiz used to store drugs and money. CS #1 described cars consistent with the Gray Honda and the Black Honda. CS #1 also told officers that Guzman Ruiz told him/her that he carried a gun under the seat in his car. According to CS #1, Guzman Ruiz told him/her that his brother, who the MPD subsequently identified as Andres Emilio Guzman ("A. Guzman"), was also involved in the drug business and that he drove a Brown Honda that had a similar aftermarket hidden compartment.[5]

_____

[4] While cooperating, CS #1 maintained a social relationship with Guzman Ruiz so as not to raise his suspicions. CS #1 keeps officers updated about things that he/she considers relevant to the investigation but is not required to tell us every contact he/she has with Guzman Ruiz. I am aware that they speak regularly. CS #1 is, of course, not allowed to engage in illegal activities outside of our direction and I have no reason to believe that he/she engages in drug trafficking-related business with Guzman Ruiz except when instructed to do so by the MPD.

[5] At one point, CS #1 told officers that he/she could not give a description of Guzman Ruiz's brother, leading them to believe he/she had not met him. Later in the investigation, officers showed CS #1 a photo lineup and CS #1 picked A. Guzman out in the lineup and identified him as Guzman Ruiz's brother. I believe that this is in fact Guzman Ruiz's brother as they have a last name in common and are observed together frequently.

9.     The MPD has instructed CS #1 to make various controlled drug purchases from Guzman Ruiz. On October 10, 2019, CS #1 placed a phone call to Guzman Ruiz, using telephone number (603) 509-6957 in the presence of MPD officers, and requested to purchase 12 "fingers" (approximately 120 grams) of heroin/fentanyl.[6] I know, based on my training and experience, that a finger is a compressed cylinder containing approximately ten grams of heroin or fentanyl. CS #1 explained that in addition to paying for those drugs, he/she would also have to pay Guzman Ruiz $400 owed from a previous drug debt. In addition, CS #1 explained that when CS #1 ordered 12 fingers, Guzman Ruiz would "front" him/her an additional six fingers. CS #1 therefore expected to receive 18 fingers even though he/she ordered 12. MPD officers searched CS #1 and his/her vehicle for money or contraband, provided CS #1 with MPD recorded currency, and outfitted CS #1 with a recording device. They kept CS #1 under surveillance as CS #1 went to meet Guzman Ruiz, who arrived driving the Gray Honda. Officers observed CS #1 get in the Gray Honda for approximately 3-4 minutes. They then observed CS #1 exit the car and surveilled CS #1 to a designated meeting location where CS #1 turned over approximately 180 grams of a mixture and substance that MPD officers believed, based on their training and experience, to contain heroin or fentanyl.[7] CS #1 said that when he/she entered Guzman Ruiz's vehicle, Guzman Ruiz used the windshield wiper switch to open a hidden compartment, or "hide," which was located in the dash board above the

---

[6] CS #1 has used this same telephone number to contact Guzman Ruiz during every controlled purchase.

[7] Laboratory analysis subsequently confirmed that the drugs purchased contained approximately 179.7 grams of a substance containing acetyl fentanyl, fentanyl, and heroin. No other lab results have been received to date.

center console. CS #1 said that Guzman Ruiz took the drugs out of the hide and placed the CS's cash inside the hide. CS #1 said he/she observed other packages of drugs in the hide as well. CS #1 took a photo of the hide in the Gray Honda and provided it to MPD officers. CS #1 and his/her vehicle were searched after the purchase with negative results.[8]

10.    On October 15, 2019, the MPD instructed CS #1 to conduct a second controlled buy from Guzman Ruiz. CS #1 placed another order for approximately 120 grams of heroin/fentanyl from Guzman Ruiz. Guzman Ruiz was not immediately available and CS #1 understood that Guzman Ruiz had to delay the deal because he needed to finish preparing the drugs.

11.    When the deal occurred a few hours later, officers observed CS #1 travel to the designated meeting location where Guzman Ruiz arrived in the Gray Honda. CS #1 got in the Gray Honda. Approximately 1-2 minutes later, CS #1 returned to his/her vehicle. CS #1 then drove to meet MPD officers at a predetermined meeting location and turned over approximately 180 grams of a substance containing what MPD officers believed, based on their training and experience, to be heroin/fentanyl. Again, per their previous agreement, Guzman Ruiz gave CS #1 an extra approximately 60 grams. CS #1 explained that when he/she was in the car, Guzman Ruiz again took the drugs out of the

---

[8] The procedures discussed in this paragraph, including the searches of the CS, the provision of recorded currency and recording devices, and close surveillance, were followed for each of the controlled purchases discussed in this affidavit.

hide in the dashboard above the center console. Officers surveilled Guzman Ruiz after the purchase and saw him go to the Bridge Street Residence.[9]

12.     Later that night, CS #1 contacted officers and told them that Guzman Ruiz had called him/her and was planning to come by CS #1's house to give him/her something. Officers instructed CS #1 to tell Guzman Ruiz that he/she was unavailable. Officers then observed the Gray Honda come from the Bridge Street Residence and arrive outside CS #1's residence. They then observed someone leave the car and enter the residence for approximately 30 seconds and then come back out. According to CS #1, he/she told Guzman Ruiz that he/she was unavailable and Guzman Ruiz said that he would leave something for CS #1 in the dryer, located in a common area of the residence. CS #1 went down to the dryer and found a finger, approximately ten grams, of heroin/fentanyl. CS #1 then brought the drugs to law enforcement officers. CS #1 did not know why Guzman Ruiz brought him/her the extra drugs. Officers suspect it may be because Guzman Ruiz kept CS #1 waiting earlier in the day when CS #1 ordered the larger quantity of drugs.

13.     On or about October 22, 2019, United States Magistrate Judge Daniel J. Lynch signed a search warrant authorizing the installation and monitoring of a tracking device on the Gray Honda. Monitoring the tracking device has led MPD officers to

---

[9] I have monitored a fixed camera outside of this residence and believe that four people who may be otherwise unrelated to this organization live there. As this is a single family residence, I believe that these people may allow Guzman Ruiz, Zapata, and their group to use the residence for their drug business. Guzman Ruiz, Zapata, and Z. Guzman do not live there. I know that drug users frequently allow dealers to use their residence for drug business and receive payment in drugs or money. The police were recently called to the residence for a domestic dispute and the residents were generally unwilling to speak to police.

believe that Guzman Ruiz resides at the Country Club Drive Residence, as the Gray Honda was parked there almost every night. He also travels most days to the Bridge Street Residence and the Manchester Street Residence where he often remains for some time.

14.     Officers conducted two additional controlled purchases from Guzman Ruiz in the Gray Honda. On October 24, 2019, Guzman Ruiz sold CS #1 approximately 180 grams of heroin or fentanyl in the vehicle. Guzman Ruiz came directly from the Bridge Street Residence to meet CS #1. After the purchase, Guzman Ruiz made a stop at another location, and then returned to the Bridge Street Residence. On November 4, 2019, officers conducted another controlled buy. CS #1 called Guzman Ruiz and ordered drugs. Guzman Ruiz agreed to sell to him/her but then called CS #1 back shortly thereafter telling him/her that he just sold "two" and would need to go pick up the rest. Guzman Ruiz then drove to the Bridge Street Residence and went inside for approximately two minutes. Guzman Ruiz then drove directly to meet CS #1 to sell him/her approximately 187 grams of suspected heroin/fentanyl in the Gray Honda. I therefore believe that Guzman Ruiz picked up the drugs he needed to sell to CS #1 at the Bridge Street Residence. After the sale, the Gray Honda returned directly to the Bridge Street Residence. As Guzman Ruiz often comes from the Bridge Street Residence before selling CS #1 drugs and returns thereafter, I believe he may use the residence to store drugs and/or money obtained from drug sales.

*Controlled Buy in the Black Honda*

15.     On November 14, 2019, CS #1 placed a call to Guzman Ruiz and ordered the same quantity of drugs. On this day, officers observed Guzman Ruiz driving the

Black Honda. Before meeting CS #1, the Black Honda drove to the Bridge Street Residence. The driver went inside for about seven minutes, returned to the Black Honda and drove directly to meet CS #1 at the predetermined meeting location. CS #1 entered the Black Honda for approximately four minutes, and then left. CS #1 then met with officers and turned over approximately 180 grams of suspected heroin/fentanyl that he/she said he/she bought from Guzman Ruiz. According to CS #1, Guzman Ruiz utilized a different hide in this vehicle, located on the back of the front passenger's seat. CS #1 observed Guzman Ruiz take the drugs out of the hide and put the money in it after the sale. After leaving CS #1, Guzman Ruiz drove directly to the Manchester Street Residence. Officers observed him enter the residence.

16.     According to CS #1, Guzman Ruiz told him/her that the battery on the Gray Honda had died and he/she was now using the Black Honda instead. Officers monitoring the tracking device confirmed that the Gray Honda has in fact been parked at the Country Club Drive Residence for some time and has not moved.

*The Manchester Street Residence, A. Guzman, and Zapata*

17.     CS #1 told officers that, based on information Guzman Ruiz told him/her, he/she believed that Guzman Ruiz's source of supply is a person named "Gordo." He/she believed that Gordo has a person named "Simon" register vehicles for him and gave officers a license plate of a car that he/she believed Gordo to drive. Officers ran the license plate and determined that in January of 2019, the MPD stopped Franlis Fernando Zapata Rivera ("Zapata") driving that vehicle. That vehicle is in fact registered to a man named Simon.

18.     CS #2 and CS #3 used to work selling drugs for a distributor who in turn received his drugs from "Gordo" who other officers and I have identified as Zapata.[10] CS #2 met Zapata (who he knew as Gordo) on various occasions. On one occasion, CS #2 met Zapata at the Bridge Street Residence and picked up a quantity of heroin/fentanyl from him to sell. CS #2 at that time (late 2018/early 2019) believed that Zapata lived at the Bridge Street Residence.[11] On November 6, 2019, CS #2 was shown a photo line-up of Zapata along with five other like looking individuals. CS #2 said that Zapata was "Gordo" and he/she was 100% confident in the identification.

19.     CS #3 had also met Zapata (who he/she also knew as Gordo) but only on one or two occasions. However, one time, CS #3 observed Zapata cut open a dead fish and remove a large quantity of heroin/fentanyl from within the fish.  On November 6, 2019, CS #3 was shown a photo line-up of Zapata along with five other like looking individuals.  CS #3 identified Zapata as "Gordo" and CHS2 said he/she was 70% confident in the identification.

---

[10] CS #2 is cooperating in hopes of receiving credit with respect to pending criminal charges. CS #2 has not yet received any credit. CS #2 does not have any convictions for any crimes. When CS #2 was recently arrested he/she was using a fake identification. Since CS #2 began cooperating, other officers and I have corroborated CS #2's information through surveillance and other sources and have found it to be reliable. CS #3 is in a romantic relationship with CS #2 and was arrested and charged with drug charges arising out of the same conduct as CS #2. CS #3 is also cooperating in hopes of receiving credit for those charges and has not yet received any credit. CS #3 has a conviction for Credit Card Fraud. Since CS #3 began cooperating, other officers and I have corroborated CS #3 information through surveillance and other sources and have found it to be reliable. On one occasion, CS #2 and CS #3 came to cooperate with law enforcement officers who found a small amount of marijuana in their car. They said that they did not realize it was illegal. Officers have provided CS #2 and CS #3 with gas money on more than one occasion (totaling approximately $60).

[11] Surveillance of that residence makes clear that Zapata does not currently live there.

20.     The tracking device on the Gray Honda showed that before the battery died, it frequently traveled to a parking lot behind 81-92 Manchester Street, Manchester, New Hampshire. This is the parking lot for the Manchester Street Residence as well as some neighboring apartments. Officers have conducted frequent surveillance of this parking lot via a fixed camera. Based on this surveillance, the MPD determined that A. Guzman, and an unidentified male ("UM") appear to reside at the Manchester Street Residence, as they are there daily and stay there overnight.[12]

21.     During the first few weeks of surveillance, officers noticed that although they slept at the Manchester Street Residence (number 91), both men frequently went back and forth through the back parking lot to the door of 83 Manchester Street. Officers conducting surveillance also observed Zapata and Guzman Ruiz frequenting both 83 and 91 Manchester Street. On at least one occasion, one of them arrived at the door of 83 Manchester street and tried to open it unsuccessfully. They then went to 91 Manchester street and appeared to receive a key, which they then used to open the door to 83 Manchester Street. The four individuals (Guzman Ruiz, Zapata, A. Guzman, and UM) have also been observed bringing plastic shopping bags between both residences as well. Sometimes they will transfer the bags to or from vehicles in the parking lot.

---

[12] On November 4, 2019, the Manchester Fire Department, at the direction of the MPD, knocked on doors of people in this area to ask whether their smoke detectors were in check. When they knocked on the door of the Manchester Street Residence, Guzman Ruiz answered. He invited firefighters inside the residence and showed them smoke detectors. Guzman Ruiz and UM were the only people there. Firefighters observed that the apartment contained a kitchen, living room, and two bedrooms. They noticed that there were an unusual number of locks on the front door (which is not the door that A. Guzman and UM use to access their apartment). I know, based on my training and experience, that drug traffickers frequently fortify their residences to impede police or attempted robberies by others involved in the drug trade.

22.     On November 4, 2019, the MPD received a call related to an allegation of someone threatening another person with a firearm at the 81-83 Manchester Street apartment building. Per standard procedure, patrol officers canvassed the building, knocking on doors to collect information about the incident. They knocked on one door that officers had seen UM enter previously. Before they knocked, they heard voices inside. After they knocked, the voices went silent and no one came to the door.

23.     The next day, around 10:30 a.m., officers conducting surveillance observed Zapata drive up to the door of 83 Manchester Street. Zapata propped the door open and he and UM moved various things into the trunk of Zapata's car. These items included a suitcase, a duffel bag, what appears to be a bucket containing something heavy, a table and chairs. Later that day, Zapata drove to the Bridge Street Residence. He went inside the Bridge Street Residence and exited shortly thereafter with a duffel bag.

24.     Officers believe that Zapata and others may have used an apartment in 83 Manchester Street as a stash house. When officers knocked on the door, Zapata may have decided to move items, which I believe may be drugs or drug paraphernalia, out of the residence. For at least a week after that incident, Zapata and others were not observed entering the 81-83 Manchester Street building. This was a marked change from their behavior prior to the police going through the building.

25.     However, UM, A. Guzman, Zapata, and Guzman Ruiz continued to frequent the Manchester Street Residence. On November 10, 2019, Guzman Ruiz, UM, and A. Guzman all left the Manchester Street Residence in the Black Honda. Later that day, they returned. Still later, Guzman Ruiz and UM left the Manchester Street Residence and entered the Black Honda. They then drove to the Bridge Street Residence.

26.     More recently, members of this group have been observed back in the 81-83 Manchester Street apartment building, though less frequently. For example, on November 16, 2019, Zapata went into both 81 Manchester Street and the Manchester Street Residence.

*The Brown Honda & the Manchester Street Residence*

27.     As mentioned previously, CS #1 told me that Guzman Ruiz told him/her that Guzman Ruiz's brother drove a brown Honda with an aftermarket hide in it. Officers have confirmed that an A. Guzman who frequently meets with Guzman Ruiz at the Manchester Street Residence drives a brown Honda matching CS #1's description. Officers have observed A. Guzman driving it on a daily basis. As we have corroborated CS #1's information about the hides in the Gray Honda and the Black Honda, I believe that A. Guzman uses the Brown Honda for drug trafficking as well.

28.     In addition, officers observed him use the Brown Honda for what I believe to be drug transactions on two occasions. On November 6, 2019, at 3:02 p.m., A. Guzman left the Manchester Street Residence and opened the Brown Honda driver's side door. He leaned all the way in the car and then left and returned to the Manchester Street Residence. At 3:14 p.m., an unidentified male walked from a nearby alley up to the Brown Honda. He opened the front passenger's door and leaned inside. He closed the door and walked away. At approximately 4:32 p.m., A. Guzman exited the Manchester Street Residence, leaned into the Brown CRV, then closed the door, appeared to lock the vehicle (as the lights flashed) and returned to the Manchester Street Residence.

29.     On November 7, 2019, officers observed A. Guzman leave the Manchester Street Residence with a cell phone to his ear and open the driver's side door of the Brown

CRV. He then returned to the Manchester Street Residence. Four minutes later, an unidentified male walked from down an alley, approached the Brown CRV, opened the front passenger's side door, closed it again and walked away.[13] Four minutes later, the lights flashed on the Brown CRV as if it was locked by someone in close proximity. About an hour later, A. Guzman left the Manchester Street Residence, leaned into the front seat of the car, and walked away. Based on my training and experience, I believe these observations are consistent with drug transactions. I believe that A. Guzman may have left drugs in the vehicle, the unidentified male may have picked them up and left money, and A. Guzman may then have returned to his car to pick up the money later. Conducting a transaction in this manner decreases the chance of law enforcement officers observing a hand to hand exchange on the street. It also avoids the customer seeing the distributor's face, making it harder for the customer to identify his supplier if he talks to law enforcement officers. In addition, I believe that A. Guzman brought drugs from the Manchester Street Residence to put in the car, and returned to the residence with drug proceeds.

*The Country Club Drive Residence*

30.     I believe that Guzman Ruiz lives at the Country Club Drive Residence as his cars (the Gray CRV and the Black Honda) have been parked outside the apartment building nearly every night for the past month and a half. On two occasions (October 15, 2019, and October 30, 2019), MPD officers conducting surveillance observed Guzman

---

[13] The person's appearance is consistent with the person who entered the car the day before, but I cannot confirm they are the same person.

Ruiz enter apartment #25. In addition, I am aware that in November of 2018, Guzman Ruiz was involved in a traffic accident. The report from that accident lists a different address in Manchester as his address. According to law enforcement records, Maria Fernandez is associated with that address. The same woman's name is associated with the Country Club Drive Residence.

31.     Guzman Ruiz frequently travels between the Bridge Street Residence, the Manchester Street Residence, and the Country Club Drive Residence. For example, on October 15, 2019, after he sold fentanyl to CS #1, Guzman Ruiz drove to the parking lot of the Manchester Street Residence and then to the Country Club Drive Residence. On October 30, 2019, he left the Country Club Drive Residence in the morning, went to the gym and a barber shop, then went to the Bridge Street Residence, then the Country Club Drive Residence, then the Manchester Street Residence, and then back to the Country Club Drive Residence.

32.     Other officers and I have never observed Guzman Ruiz with any legitimate employment. I know, based on my training and experience, that drug traffickers frequently store evidence of drug trafficking and drug proceeds in their houses. In addition, I believe that the telephone that Guzman Ruiz uses to discuss drug sales with CS #1 will be found in his residence or on his person.

<u>Training and Experience Concerning Items to be Seized</u>

33.     Based upon my training and experience, as well as the collective knowledge and experience of other agents and police officers in my office, I am aware that drug traffickers very often store controlled substances, firearms, and other tools of the drug trade in their homes, automobiles, garages or outbuildings on their properties,

basements, or other places under their immediate control. I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other locations they access with frequency. Based on my training and experience, powder drugs such as fentanyl are generally brought into the region in bulk. However, such drugs are not typically consumed by users in such high purity form. Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level. High purity powder drugs are reduced in purity by the addition of dilutants. This process is called "cutting" or "stepping on" the drug. Other equipment, such as scales, grinders, razor blades, glass panes, blenders, and mirrors, and the like are typically used in this cutting process. Once the drug has been "cut," a usual practice is to repackage it in smaller quantities in heat-sealed and/or other types of plastic bags for redistribution.

34.     It is generally a common practice for drug traffickers to maintain in hard copy or on other electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. I know Guzman Ruiz fronted CS #1 drugs in this case.

35.     Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally

17

maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

36.    Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

37.    It is also a generally common practice for traffickers to conceal at their residences or other places they access frequently large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported

18

assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. I know that drug traffickers from other countries, like Guzman Ruiz, frequently wire drug proceeds to their country of origin. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers sometimes purchase real estate with suspected drug proceeds. They may keep records of real estate transactions, money received from rental properties, and other such documents in their residences. CS #1 has known Guzman Ruiz to be in the drug business for approximately four years. Therefore, I believe that financial documents dating back to 2015, four years earlier, may provide evidence of drug trafficking and sources of income.

38.     Based on my training and experience, I know that individuals involved in the distribution of controlled substances attempt to hide the true identity of their residence and, further, employ methods of surveillance at such residence in order to evade law enforcement. For example, there is no name on the mailbox for the Country Club Drive Residence. Typically, these individuals will maintain at their residence documents relating to the identity of the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles

people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. I know that drug traffickers often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

39.     Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs. CS #1 said that he/she believed Guzman Ruiz carried a firearm.

40.     Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and US currency are often located in a residence or on an individual's person.

41.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

42.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

<u>Training and Experience on Digital Devices</u>

43.     In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

44.     As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from many cell phones. I know, based on my training and experience, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, and Instagram, to communicate with people in other countries (often

countries from where drugs are brought into the United States) and with people who are most cautious about law enforcement detection.

45.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case, such as one here, where investigators have analyzed telephone toll records between involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

46.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that

during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

  a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

  b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

  c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more

gigabytes are now commonplace.  Consequently, just one device might

contain the equivalent of 250 million pages of data, which, if printed out,

would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a

500 gigabyte drive could contain as many as approximately 450 full run

movies or 450,000 songs.

d.  Electronic files or remnants of such files can be recovered months or even

years after they have been downloaded onto a hard drive, deleted, or

viewed via the Internet.  Electronic files saved to a hard drive can be

stored for years with little or no cost.  Even when such files have been

deleted, they can be recovered months or years later using readily-

available forensics tools.  Normally, when a person deletes a file on a

computer, the data contained in the file does not actually disappear; rather,

that data remains on the hard drive until it is overwritten by new data.

Therefore, deleted files, or remnants of deleted files, may reside in free

space or slack space, i.e., space on a hard drive that is not allocated to an

active file or that is unused after a file has been allocated to a set block of

storage space, for long periods of time before they are overwritten.  In

addition, a computer's operating system may also keep a record of deleted

data in a swap or recovery file.  Similarly, files that have been viewed on

the Internet are often automatically downloaded into a temporary directory

or cache.  The browser typically maintains a fixed amount of hard drive

space devoted to these files, and the files are only overwritten as they are

replaced with more recently downloaded or viewed content.  Thus, the

ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such

as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.  Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

47.     Based on my training and experience, I believe that it is likely that the Country Club Drive Residence will contain a smartphone that can be unlocked via the use of a fingerprint in lieu of a numeric or alphanumeric password. I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of devices such as iPhones and iPads, offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

48.     If a user enables Touch ID on a given device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

49.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a

short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

50.     Although Apple's Touch ID may be the most common or well-known means for unlocking a device with a fingerprint, I am aware that other brands of smartphones like Samsung also offer a similar feature that works essentially the same way. Therefore, when I refer to "Touch ID" I am not just referring to Apple devices, but to similar technology on all smartphones. While I believe that Guzman Ruiz likely uses a smartphone, I am not aware of the particular brand of phone that he uses.

51.     The passcodes that would unlock his device is not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock devices with the use of the fingerprints of the user is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

52.     Based on the facts discussed in this affidavit I believe that Guzman Ruiz is the primary user of (603) 509-6957 and thus his fingerprints are among those that are able to unlock the device via Touch ID. We intend to call this number when searching the premises where we believe he resides. If the phone rings, and the user is present, I request authority to place his fingers on the Touch ID sensor to unlock the device.

<u>Conclusion</u>

53.     For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of Title 21, United States Code, Sections 841(a)(1) and 846 will be found by searching the locations described in Attachments A. Based upon my training and experience I believe that the items set forth in Attachments B are commonly possessed by drug traffickers in their homes, automobiles, on their cell phones, or in other places under their control and that those items are evidence of violations of the offenses being committed by Guzman Ruiz, A. Guzman, Zapata, and others.

Respectfully Submitted,

/s/ Kevin Rutina
Kevin Rutina
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me on November 22, 2019.

ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### 322 Bridge Street, Manchester, New Hampshire

This search warrant authorizes the search of the premises located at 322 Bridge Street in Manchester, New Hampshire, including all safes, containers, and enclosures therein and any shared basement, attic or common areas in the 322 Bridge Street home. The premises located at 322 Bridge Street is a single family residence with white siding, white trim, and blue shutters. There are no numbers on the front of the address. The residence is accessed by an exterior door on all four sides of the residence. A small set of poured cement stairs leads to a side door on the right side of the building.



**ATTACHMENT B**
**Bridge Street Residence**

1.      Controlled substances including, but not limited to heroin and fentanyl;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers believed to be used by Zapata, Guzman Ruiz, A. Guzman, or co-conspirators and electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books;

5.      Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

7.      Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

8.      Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

9.      Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

10.     Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11.     Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning Guzman Ruiz, Zapata, A. Guzman, business entities in which they are stakeholders, or co-conspirators; and

12.     Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

## ATTACHMENT A

### 91 Manchester Street, Apartment #2, Manchester, New Hampshire

This search warrant authorizes the search of the premises located at 91 Manchester Street, Apartment #2 in Manchester, New Hampshire including all safes, containers, and enclosures therein and any shared basement, attic or common areas in the 91 Manchester Street residence. The premises located at 91 Manchester Street is a multi-level building with red brick, white trim, and no shutters. The front of the building has the words "Heritage Stained Glass" across the front, though the first floor of the building appears unoccupied. The front door is clearly marked by black numbers on the outside as 91. This building is two levels with 3 and 4 story buildings on each side of it. There is a wooden staircase in the rear of the residence which leads to an unmarked rear entry door. This door leads directly into 91 Manchester Street, Apartment #2, Manchester, NH.



## ATTACHMENT B
## Manchester Street Residence

1.      Controlled substances including, but not limited to heroin and fentanyl;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers of UM, A. Guzman, Zapata, and Guzman Ruiz, and electronic equipment used for counter-surveillance such as scanners, police radios or monitors, surveillance cameras and monitors;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books used or believed to be used by Guzman Ruiz, UM, Zapata, or A. Guzman, or co-conspirators;

5.      Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.      Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7.      Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2015 to the present;

8.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9.  Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10. Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11. Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12. Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

13. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning targets of the investigation referenced herein, business entities in which they are stakeholders, or co-conspirators;

14. Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

## <u>ATTACHMENT A</u>

### 4 Country Club Drive, Apartment 25, Manchester, New Hampshire

This search warrant authorizes the search of the premises described as Apartment 25 of an apartment building located at 4 Country Club Drive, Manchester, New Hampshire, including all safes, containers, and enclosures therein. The apartment building has red brick and white siding with red shutters and three floors. In front of the apartment building is a blue and white sign labeled "4." Apartment 25 is located on the 2nd floor and is clearly marked with numbers reading "25" on the entry door.



**ATTACHMENT B**
**Country Club Drive Residence**

1.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

2.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, and address books;

3.      Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

4.      Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

5.      Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2015 to the present;

6.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

7.      Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

8.      Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

37

9.      Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

10.     Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

11.     Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning Guzman Ruiz, business entities in which he is a stakeholder, or co-conspirators;

12.     Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

13.     Cellular telephones including the cellular telephone assigned call number (603) 509-6957 used primarily by Guzman Ruiz. I seek to search this telephone for:

        a.  Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

        b.  lists of customers and related identifying information;

        c.  types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

        d.  any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

        e.  any information involving the travel to obtain controlled substances or the transportation of controlled substances;

        f.  information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, and Instagram stored on the phone);

        g.  all bank records, checks, credit card bills, account information, and other financial records

h.  Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

During the execution of the search of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of Guzman Ruiz if found at the Subject Premises, to the fingerprint sensor of the devices found at the Subject Premises for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**ATTACHMENT A**
**Gray CRV**

A 2006 Honda CRV color gray bearing New Hampshire license plate number 435 5105 and vehicle identification number (VIN) SHSRD78826U444143 registered to Simon Sepulveda Saez, 502 Spruce St., Apartment 3, Manchester, New Hampshire ("the Gray CRV").

**ATTACHMENT B**
**Gray CRV**

1.      Controlled substances including, but not limited to heroin and fentanyl;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic
        baggies, wrapping material, paper or plastic bundles, zip lock bags;

3.      Devices used to communicate with other drug traffickers or buyers including
        cellular telephones and pagers; electronic equipment used for counter-surveillance
        such as scanners, police radios or monitors;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists,
        seller lists, ledgers, records of sales, records of expenditures made to purchase
        drugs or chemicals and apparatus used to manufacture drugs, buyer lists,
        telephone lists, address books;

5.      Large amounts of currency (exceeding $500) or readily transported assets which
        are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds,
        precious jewels, etc.); prepaid debit cards and gift cards;

6.      Materials evidencing the receipt of large amounts of cash including bank
        statements and related records, passbooks, letters of credit, money drafts,
        cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return
        work papers, escrow files, Forms 1099, wire transfer records, and other items
        evidencing the obtaining, secreting, transfer, concealment, and expenditure of
        money related to drug trafficking activities;

7.      Bank and other financial institution records, showing acquisition, conversion,
        movement, secreting, transfer and disbursement of United States and foreign
        currency from 2015 to the present;

8.      Materials evidencing expenditure of drug trafficking proceeds including, purchase
        of large assets, including digital image storage devices, records of real estate or
        securities transactions, escrow files, wire transfer records, automobiles or trucks
        purchased with cash or cash equivalents; credit and debit card records, including
        records of purchases, withdrawals, deposits and cash advances made with credit
        and debit cards, and including statements and receipts;

9.      Photographs, negatives, video tapes, and films, depicting the subjects of the
        investigation and their criminal associates, (showing association with the
        associates, depicting their assets or depicting controlled dangerous substances);

10. Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11. Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12. Indicia of possession of the place to be searched;

13. Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning Guzman Ruiz;

14. Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

**ATTACHMENT A**
**Black Honda**

A 2015 Honda CRV color black bearing New Hampshire license plate number 457 5629 and vehicle identification number (VIN) 5J6RM4H33FL090327registered to Simon Sepulveda Saez, 502 Spruce St., Apartment 3, Manchester, New Hampshire ("the Black Honda").

# ATTACHMENT B
## Black Honda

1. Controlled substances including, but not limited to heroin and fentanyl;

2. Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, zip lock bags;

3. Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4. Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books;

5. Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6. Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7. Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2015 to the present;

8. Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles or trucks purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9. Photographs, negatives, video tapes, and films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10. Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers

and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11.     Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12.     Indicia of possession of the place to be searched;

13.     Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning Guzman Ruiz;

14.     Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

**ATTACHMENT A**
**Brown CRV**

A 2002 Honda CRV color brown bearing New Hampshire license plate number 464 6729 and vehicle identification number (VIN) JHLRD78522C080510 registered to Jonathan Roig, 11 Temple Ct., Apartment 1C, Manchester, New Hampshire ("the Brown CRV").

## ATTACHMENT B
## Brown CRV

1.  Controlled substances including, but not limited to heroin and fentanyl;

2.  Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, zip lock bags;

3.  Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors;

4.  Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books;

5.  Large amounts of currency (exceeding $500) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.  Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7.  Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2015 to the present;

8.  Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, automobiles or trucks purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9.  Photographs, negatives, video tapes, and films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10. Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers

and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11.     Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12.     Indicia of possession of the place to be searched;

13.     Books, records, ledgers, journals, statements, receipts, invoices, billings, financial statements, balance sheets, notes and work papers concerning A. Guzman;

14.     Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.